IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
Plaintiff )
)
-VS- ) Criminal No. 25-10045-PBS
) Pages 1 - 25
LINA MARIA OROVIO-HERNANDEZ, )
)
Defendant )

**DETENTION HEARING**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

JAMES J. NAGELBERG, ESQ., Assistant United States Attorney, Office of the United States Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.

JESSICA P. THRALL, ESQ. and ELIZA SULLIVAN WALKER, ESQ., Federal Public Defender Office, 51 Sleeper Street, 5th Floor, Boston, Massachusetts, 02210, for the Defendant.

ALSO PRESENT: Gabriel Hadad, Spanish Interpreter.
Kalleen Paiva, U.S. Probation Office.

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts 02210
April 9, 2025, 10:29 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
leemarz47@gmail.com

P R O C E E D I N G S

THE CLERK: Court calls Criminal Action 25-10045, United States v. Hernandez. Could counsel and Probation please identify themselves.

MR. NAGELBERG: Good morning, your Honor. James Nagelberg on behalf of the United States. And with me at counsel table, this is our paralegal, Julia Gelman, who will be assisting. There are some exhibits we may display today, your Honor.

THE COURT: Thank you.

MS. THRALL: Good morning, your Honor. Jessica Thrall and Eliza Walker for the defendant.

MS. PAIVA: Good morning, your Honor. Kalleen Paiva on behalf of the Probation Office.

(Interpreter Hadad duly sworn.)

THE COURT: Now, this is an appeal of a bail, or more accurately, a detention decision which I have to think about de novo. I have read the magistrate Judge's order. I've read both briefs. I can't say I've memorized all the exhibits attached by the government, but I skimmed through them. I don't know that they've actually been challenged, but we're just here essentially to determine whether there is a combination of conditions of release that will reasonably assure the appearance of the defendant. As I understand it, this is not a dangerousness hearing, right?

MR. NAGELBERG: That's correct, your Honor. Only on risk of flight.

THE COURT: Risk-of-flight case.

All right, government, go for it.

MR. NAGELBERG: Your Honor, I may want to sit at some points just to navigate some of the exhibits. Is that okay?

THE COURT: Yes. I'm not sure she contested the weight of the evidence.

MR. NAGELBERG: Excuse me, your Honor?

THE COURT: You're going to go through the exhibits to show that she's guilty? Is that the gist of it?

MR. NAGELBERG: No, your Honor.

THE COURT: Oh, this is something else. All right, go ahead.

MR. NAGELBERG: Just if there are questions, it might be helpful to have them in front of us. I've also provided paper copies to the Clerk as well, if that's easier to flip through.

THE COURT: Okay, thank you.

MR. NAGELBERG: But I do have the electronic so I can highlight certain portions, your Honor.

I think the facts here, with one exception, I don't think are in dispute. I think as I walk through the weight of the evidence here and the nature and circumstance of the offense, there are recorded interviews with law enforcement

where the defendant readily admits to the conduct that's been charged. She has admitted during an interview on December 23, 2024, that she had submitted a passport application at a local post office on November 26, 2024. She admitted that she had been receiving various forms of public assistance benefits, including the Section 8 housing benefits that are the subject of Count 4 of the indictment. She presented various forms of identification, including a 2024 Massachusetts Real ID card that's the subject of Count 1. And in total, your Honor, as I walk through this, there is Count 3 for aggravated identity theft.

While there are some things here that have not yet been charged or possibly won't be charged, such as SNAP benefits or food stamps and Social Security benefits, as well as registering to vote and then voting in the 2024 Presidential election, all of those are factors where they are evidence of Count 3, the aggravated identity theft, because it shows that the ID had been subjected to government scrutiny on multiple occasions, so that the defendant would know that this did actually belong to a real person.

So let me walk through, how did we find out about this case? How did the investigation begin? So on November 26, 2024, the defendant submitted that passport application in a local post office here in Massachusetts. In the ordinary course, the State Department ran the picture submitted with

that application through a facial-recognition search in their databases for any other pictures that would possibly be the defendant; in that case, the applicant at that point. And what they discovered is that the defendant, even though she applied under a U.S. citizen's name and using their identifiers, both their Social Security number and their date of birth, they had actually -- they were not that person. The picture that came up for a hit in the State Department databases was from a 2003 visa application filed in Colombia at the U.S. Embassy.

And so, your Honor, in our brief, we actually show these pictures side by side. So you'll see here in the passport application --

THE COURT: I don't want to cut you short, but I don't think she's challenging the strength of the evidence. Maybe I'm wrong, in which case you can come back and respond.

MR. NAGELBERG: And so, your Honor, this brings me to the second point. There is no dispute on all this conduct that occurred. Where there is a dispute, as I understand it, is that the only defense that will be raised is that the defendant is actually this individual with abbreviated initials EC, this woman who was born several years later in Puerto Rico and is a U.S. citizen, the identity that she's taken.

And so what I'm showing with the weight of the evidence here, your Honor, is that we have a number of photographs included in the brief showing similarities between

the defendant and these Colombian documents. Additionally --

THE COURT: Oh, so there might be a challenge that she really is this woman from Puerto Rico?

MR. NAGELBERG: That's the only possible defense I have heard of, your Honor, in this case.

THE COURT: Well, all right, I didn't realize that. That really wasn't addressed in the brief. It was more, you know, you can't just look at the weight of the evidence.

MR. NAGELBERG: Correct, your Honor, and the government's position is not that you would only look at the weight. I think it's a totality. I think in every case there would be certain factors that weighed more in favor of the government's position than the others. In this case, Judge Cabell said in his order that he found the evidence to be decidedly strong with the weight of the evidence, and I think that's correct.

So if it is in fact disputed that the defendant is not a Colombian national, that she's actually this woman that you see, the main points of evidence that we presented in our brief and earlier, one of the photographs where the similarities over the years are self-apparent.

Second, your Honor, is that there were --

THE COURT: Self-apparent in that you think she looks like the woman?

MR. NAGELBERG: The Colombian national, correct, your

Honor.

THE COURT: She looks like the Colombian national but not the Puerto Rican woman?

MR. NAGELBERG: We do not have a picture of the Puerto Rican woman at this time, your Honor. We're still investigating, but as to her actual --

THE COURT: So I don't have a picture of the Puerto Rican woman?

MR. NAGELBERG: Correct, your Honor.

THE COURT: Have you seen it?

MR. NAGELBERG: I have not, your Honor. We're still investigating.

THE COURT: So you haven't seen it?

MR. NAGELBERG: No, your Honor. But for the Colombian national, her actual identity, there are pictures dating back to 2003 --

THE COURT: What you're saying is, she looks spot on like the woman who applied for the visa in Colombia, but you haven't yet looked at what the woman looks like from Puerto Rico?

MR. NAGELBERG: That's correct, your Honor.

THE COURT: EC, is that what you're calling her?

MR. NAGELBERG: I'm calling her EC out of privacy for the victim.

THE COURT: Of course.

MR. NAGELBERG: The other evidence here, your Honor,

is fingerprints. When she was interviewed voluntarily by diplomatic security in December of 2004, she did consent to having her fingerprints taken. Those fingerprints along with fingerprints from her national identification card in Colombia were compared by the Worcester Police Department's forensics unit and the latent print examiner and found to be a match. So we have --

THE COURT: Oh, you have fingerprints too, photos and --

MR. NAGELBERG: Yes, we have photos and fingerprints. And then in addition to that, your Honor, at the time of arrest, a search warrant of the residence was executed, and there were documents found in the home linking the defendant to Colombia, and specifically to her actual identity. There was a Toys "R" Us receipt from 2015 where there was certain billing information provided, and there the defendant's actual name, her Colombian identity, Lina Hernandez, was on that. There was a phone number also included there, and that phone number we know is one she was using in and around that time because she had applied for Social Security benefits in 2014 using that same phone number.

Additionally, your Honor, we also found evidence of certain relatives that had been visiting the defendant from Colombia and coming to Boston to see her. Specifically, there was an itinerary from a Jet Blue flight.

THE COURT: You're just going on and on about the strength of the evidence, so --

MR. NAGELBERG: I can move on, your Honor.

THE COURT: So you have strong evidence, though I haven't heard the other side yet, but the real issue is whether there are a combination of conditions that can assure her appearance. I mean, it's not the strength of the evidence that's at issue here. And realistically, you know, you've charged aggravated identity theft, so there's at least a two-year mandatory minimum.

MR. NAGELBERG: Correct, which would run consecutive to the other charges as well, so --

THE COURT: Typically you get the two years, unless I hear other stuff.

MR. NAGELBERG: Understood, your Honor.

Now, moving on then, your Honor, past the weight of the evidence, the history and characteristics of this defendant which were cited by Judge Cabell in his order, first off, family ties: The defendant has no family ties here in the United States.

So the community ties, separate from this case, she has an eviction order from October for her subsidized apartment. Now, her appeal of that conviction was dismissed after the last detention hearing on February 25th, and that's Exhibit 13 to the government's brief. I understand from

talking to counsel for the property that they took possession of the residence on March 6, so at this point the defendant is homeless. Without a home, it gives her even less reason to stay in this country.

Your Honor has already touched upon the expected sentence in this case, which has a mandatory minimum because of the AG ID. As for the employment, with the exception of some limited work with a childcare provider offered by a friend, she's been on SSI disability and SNAP for over ten years, so she has not worked consistently or on a full-time basis during that time. Even if she did not have that impairment that would prevent employment, she also doesn't have lawful status in this country, so she doesn't have the legal ability to work in the United States if she were to be released.

Her financial resources, they're limited, but, on the other hand, your Honor, as noted in our brief, and one of the issues that was raised in defense counsel's brief, there was another search warrant executed after the arrest when law enforcement was contacted by a friend of the defendant informing them that she had given over five bags of items to her. We later found out that the same day she contacted the friend is the day she had spotted law enforcement surveilling the property in anticipation of the arrest, and we know that through recorded jail call conversations.

The contents of those bags, your Honor, included about

$500, a little over that, in U.S. and Colombian currency. And so, again, the idea that there is simply no resources out there which the defendant has access to, we have some reason to believe that she was hiding assets in anticipation of law enforcement's actions here.

THE COURT: It's not very much money, I mean --

MR. NAGELBERG: But, your Honor, for someone who's on public assistance benefits --

THE COURT: $500 is not that much.

MR. NAGELBERG: I understand, but in weighing all these factors --

THE COURT: You're saying that she has no family, no house, no ties, not a significant --

MR. NAGELBERG: Correct. And I agree with your Honor that it's not a large sum of money, but there's something. And there's evidence that she's concealed currency in the past year, and it's more the Colombian currency as to the evidence.

Now, she's also used an alias for over 20 years in this country. She's not been using her real identity. So, again, what she will be saying to law enforcement or Probation, there's reasons to doubt the veracity of what she will be representing.

I think the most heavily weighted factor, and it was focused on by Judge Cabell, is what happened during the arrest warrant in this case, your Honor, which is very unusual for

essentially a document fraud case. The defendant did not comply with law enforcement. When they announced themselves at the door, she took active measures to prevent them from coming in. They had a key from property management. We know from jail call recordings that she looked through the peephole and recognized one of the agents who had interviewed her the month or two before, and she was actually holding the lock to prevent them coming in. Then the agents had to breach both the front door and the bedroom door to access her.

When they did apprehend her in the bedroom -- this is February in New England, it was 30 degrees outside -- she had both the window and the screen open to a first-floor unit. And there was a breeze that day; it was blowing the curtains. And so she was fully dressed at 8:00 o'clock in the morning with her shoes on. As Judge Cabell found, it appeared that she was trying to flee.

Now, on top of that, your Honor, immediately before the initial appearance, the defendant was being held in the side cell here off the courtroom. The defendant was engaging in conversation with agents, and she inquired --

THE COURT: We're now talking law enforcement agents, not ICE, right?

MR. NAGELBERG: Correct, this is diplomatic security agents and also Social Security Administration (Unclear). So arresting agents, and there was a medical issue where they had

to be with her, and so there was a slight delay, but immediately before --

THE COURT: What was the medical issue?

MR. NAGELBERG: She had complained, I believe, of chest pains. She was admitted to Tufts Medical Center for two overnights, but then she was given a clear bill of health, and she was released.

THE COURT: And she doesn't have, to your knowledge -- I don't want to talk about her private medical situation, but --

MR. NAGELBERG: I do think that's in the brief, your Honor, and I think it's been raised.

THE COURT: Does she have breast cancer still?

MR. NAGELBERG: Not to my knowledge, your Honor. In fact, I think the Pretrial Services bail report actually indicated that she was last treated for it in 2016, and she's doing annual checkups since that time. So there's no active diagnosis of cancer, no active treatment ongoing for that.

But, your Honor, again, immediately before coming in for that initial appearance, she had expressed to law enforcement, inquired of them, how long does the battery last on an ankle-monitoring bracelet? So in combination with what occurred during the arrest, that comment, I think Judge Cabell rightly viewed that as this is an increased risk of flight. This is someone who knows that there's really no future for

them in this country; and that if given the opportunity, given such overwhelming evidence against them in this case, that they are likely to go and flee if given the opportunity.

THE COURT: And just to go back to basics, does she have any status at all in the country?

MR. NAGELBERG: She has no lawful status in the country, your Honor.

THE COURT: All right, thank you.

Ms. Thrall.

MS. THRALL: Thank you, your Honor. I think the Court has really correctly honed in on the fact that we are bringing this appeal to you not because of a challenge of the weight of the evidence. This case is relatively new. We're still receiving discovery. I can't really estimate what our defense will be. We're not objecting to the government's exhibits, but -- I think we mentioned this in the brief -- the weight of the evidence is only one factor for the Court to consider in this detention appeal, and it is often viewed as sort of the least important factor. Because many cases are brought with significant evidence, it does not mean that a person must stay detained.

What we believe is that there are a combination of conditions that can reasonably assure the Court that our client will remain local, in the same area that she has lived for decades, in the same area where she has received, frankly,

life-saving medical care, and has every reason to stay and comply with court orders.

I'll start talking with the medical issue because if the Court has questions about that --

THE COURT: Well, I first was taken with the fact that she had breast cancer and may have been a reason why she might stay around for medical care, but when I saw the evidence, she's been cleared.

MS. THRALL: Sure. She absolutely has been cleared. The issue from our perspective relative to the breast cancer treatment is, she received her care at Dana Farber in Boston, and Dana Farber has tremendous wraparound services for people who have had their treatment there. She is routinely screened there. They have support services for people who have survived breast cancer. She engages in these services regularly. She does not want to be separated from that routine screening because she is high-risk.

One of the things that happened, the government is correct, there was a cardiac episode during her arrest. She was taken to Tufts Hospital instead of here to the courthouse. She was at Tufts Hospital for several days because they did not immediately clear her. I met with her at the hospital prior to her ever coming into the courthouse because the medical issues seemed pretty serious, so I met with her there. I talked to some of the doctors there. They followed up with me after she

was discharged.

One of the things that happened in addition to the assessment of her heart was a concern of a potential recurrence of cancer. She had a biopsy while she was at Tufts just that week of her arrest. Fortunately, the doctor called me and indicated that there was no concern, that there was not a recurrence of any cancer; but it was certainly on the top of their radar to assess her while she was there, and we're thrilled that there was not a recurrence.

But she operates from a place of constant concern and worry that there could be a recurrence, and I think that that is squarely a reason why she would not want to flee, particularly from the doctors who are local here in Boston who she credits with saving her life. So I think that that is a very significant factor for the Court to consider.

I think that related to her housing, we have been following along in the Housing Court and trying to sort of understand what the next steps are. She has a status conference in the Housing Court coming up on April 21st. I understand, and I don't disagree with the government's summary of what's gone on so far --

THE COURT: Has the appeal been dismissed?

MS. THRALL: I believe that the appeal has been dismissed, but --

THE COURT: She's been evicted, so she no longer has

the place, right?

MS. THRALL: I agree with that, but she wasn't present at the last hearing, and the reason she wasn't present was because she was still detained here, and that was a real significant factor.

THE COURT: Did she have a lawyer there?

MS. THRALL: No. She's been going pro se. And so the fact that she's pro se, the fact that she missed the last Housing Court appearance, and the fact that the judge there, despite this Exhibit 13, still has the case on their docket, still wants --

THE COURT: Can I ask you -- I mean, assuming for a minute, which I am, that she's undocumented and not who she says she was for purposes of this hearing, because there is strong evidence, how could she qualify for Section 8? I don't know how she gets it back.

MS. THRALL: I'm not sure she does. I'm not sure she does. And so I'm putting that all out there because she really wants it, to be able to complete that process. She wants to be present, and then this --

THE COURT: But she couldn't possibly win because of the Section 8 problem. That's the thing. I mean, you may be right that she didn't appear because she was detained, that's certainly a reasonable assumption, but I don't see how she has a likelihood of success in Housing Court.

MS. THRALL: And if she doesn't succeed, if she's convicted and she can never go back there, what I would like to do is to have her work with a social worker that I would hire through my office and work with her on finding an emergency placement in a shelter-type program that could allow her to have a space to live. I think that there are ways that we could work with a social worker, particularly around the medical issues, to get her housed, and come back to the Court with some sort of proposal that we would, you know, run through Probation, assuming the Court would be amenable to release on -- and this is where the combination of conditions becomes I think appropriate -- she would need to be on electronic monitoring. She would need to be on home confinement. She would need to be --

THE COURT: I don't know if you even can in a shelter.

MS. THRALL: You can because the bracelet components now can sort of act as their own beacon and be plugged into a wall. I've had many clients at a shelter on a bracelet. But that would allow the Probation Department to know exactly where she is. She has no travel documents. She can't leave the country. She has no resources. The idea that $500 could be reasonable, I'm not even sure could -- she certainly can't buy a plane ticket, right? She has --

THE COURT: Does she have $5,000? I thought she had $500.

MS. THRALL: $500, yes, and I think that that's now seized. So there's no resources with which to flee, no motive to flee, and without --

THE COURT: Why would there be a motive to stay? In other words, let's assume for a minute she's convicted, she's looking at two years. Let's assume she's acquitted, ICE picks her up. I don't know why there's a motive to stay. Why would you stay? That's the thing I keep coming back to. She doesn't have a family, she doesn't have a job, she doesn't have much of a community, at least that I've heard about. It's sort of a tough case because, I mean, many of these thefts are thefts of poverty, you know, but --

MS. THRALL: And, your Honor, I think the medical concern alone is a huge motive to stay. The fact that she has lived here for decades is a motive to stay. The government sort of summarized that she has been receiving Social Security disability benefits for some time. She has been working part-time at a daycare in East Boston. And it's not full-time work because it can't be with the restrictions on Social Security disability, but it's a job that she loves, and it's a job that she has had for a long time.

THE COURT: Now they can't keep her because it's clear she's not a citizen.

MS. THRALL: I don't disagree with that, but it doesn't mean she has no one here, your Honor. People build

relationships in lots of different ways that are separate from biological family, right? And she has been here for long enough that she has some support network. She worked at the airport for a long time. She has a whole life here that she does not want to leave. And she does not have the resources to leave. And if she attempted to leave, all of the electronic surveillance options that are available to the Court and the Probation Department would prevent any possible flight. She can't buy a plane ticket. She can't afford it, and she can't buy a plane ticket because she doesn't have an identification to get on an airplane. So there's nowhere that she's going, there's nowhere that she wants to go, and she has no ability to get anywhere.

So all of that I think, with the resources that Probation has to supervise people, the Court can have a warrant in abeyance, and the risk of flight just diminishes to a place where the Court can impose these conditions that will reasonably assure her appearance. You know, we have outlined a lot of these issues and the law around this in our brief, which I'm not going to repeat for the Court --

THE COURT: I of course read it. I'm very familiar with the statute because I used to be a magistrate judge. Probably many of you remember that, but I did a lot of these, so --

MS. THRALL: And one of the things that I think is

unique about this factual situation is that the government has not found or identified the person who they believe to be EC. And in many of these cases, before they're brought, the government has found that person and has been able to interview them or do some background information about them, but we don't have that here. That's a piece --

THE COURT: I know, but it's pretty compelling to have fingerprints.

MS. THRALL: I understand the weight of the evidence, and I'm not --

THE COURT: You wisely did not take that on.

MS. THRALL: I might have just enticed Mr. Nagelberg to respond in ways that I don't think he needs to respond to. But, you know, I think that she has no criminal record, and that has to also lay some foundation for the Court to trust that these conditions of release --

THE COURT: Where is she being held now?

MS. THRALL: She's at the Wyatt detention facility, your Honor. It's been awful. She was in the hospital for several days, and then she came to court and went to Wyatt, and it has been absolutely traumatic for her. You know, she was waiting with baited breath about biopsy results that ultimately I had to deliver the good news, but that is just an incredibly stressful environment for a person who has no contact with the criminal court system before this. It's very, very, very hard.

And so I don't know what the path forward here is. I don't know if this is going to trial. I don't know if this is going to be a plea, but it's going to take some time. The government's evidence is extensive. We've begun reviewing it --

THE COURT: Why is it going to take some time? I'm just trying to -- I mean, I was thinking -- I understand the Federal Defenders are often swamped, but it is not that complicated a case.

MS. THRALL: It's unraveling 20 years of a life in the United States and with a -- the government refers to as a victim, this individual EC, we don't even know who they are, right? So I think that there's a lot of --

THE COURT: I suppose there might be a fact issue as to whether she knew it was a real person or not. That's an issue I don't have the evidence for. But, in any event, listen, I think -- is there anything else anyone wants to say here?

MS. THRALL: One second, your Honor.

(Discussion between Ms. Thrall and the defendant.)

MS. THRALL: Nothing further.

THE COURT: Okay, thank you. I'm always impressed, Ms. Thrall, with your passion, and I am denying the request to revoke the detention order. I was hoping you'd come in here with a combination of conditions that perhaps weren't available

for Judge Cabell, and I haven't heard them. And I know it's just a dire situation, which is she's lost her home, she has no friends, I mean, that are able to house her apparently. She's got no money. She's got really nothing.

I don't know why she would stay, and I'm not persuaded, given the fact that thankfully the breast cancer is no longer an immediate threat, that she would stay around because the evidence is strong. And the government may have exaggerated a little bit about what she's looking at, but she's looking at at least two years unless there's, you know, a plea to something else. So at this point I'm denying it, but I would like to, contrary to what you just said, Ms. Thrall, I would like to move the case because if she didn't know it was a real person, or Federal Defenders may come up with other things, I could have it -- it's a fairly simple case all in all. You're not planning on superseding right now, are you?

MR. NAGELBERG: Your Honor, that's a distinct possibility. The SNAP fraud, the Social Security fraud, and the voting fraud is not yet charged because there's been evidence developed since the previous detention hearing, and that's in part, there have been discussions with defense counsel, so there may be additional charges --

THE COURT: Do you want me to set a trial right now?

MS. THRALL: No.

THE COURT: Okay. So it's all pending before the

magistrate judge.

MS. THRALL: Thank you.

MR. NAGELBERG: Thank you, your Honor.

THE COURT: So I think I've pretty much ruled. I just, as I say, sometimes there are no conditions or possibilities before the magistrate judge, but then some develop, but that hasn't happened. That's why I always hold a hearing to learn more about the case and see if maybe there is something out there because these are, at least so far as charged, crimes of poverty, you know, and somebody who's got a disability and somebody who's had breast cancer.

On the other hand, she has no status in the country, and so regardless, one way or another, I think her future in this country is unlikely, regardless of the criminal proceeding. And I know that's sad for her, she's been here 20 years, but these are multiple criminal violations.

Anyway, I guess I'll just remand this back to the magistrate judge. I'm happy to set a really rapid trial, just because we could wrap this up and get her out of Wyatt, which I agree is not the best in the world, but --

MS. THRALL: Your Honor, I just want to put on the record that my client wants to address the Court. I am advising her not to do that.

THE COURT: Do you want a second with her?

MS. THRALL: No.

THE COURT: She's certainly always welcome to, but understand this: There's a court reporter who's taking this down, and it can be used against you. That's why most defense attorneys are saying exactly what Ms. Thrall is saying, which is "Don't say it because it can be used against you." So why don't you give it a moment's thought and then decide whether or not you want to address me.

(Pause.)

(Discussion between Ms. Thrall and the defendant.)

MS. THRALL: Thank you. I think we're all set.

THE COURT: Thank you. We'll stand in recess. Thank you.

THE CLERK: All rise.

(Adjourned, 11:03 a.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 25 inclusive, was recorded by me stenographically at the time and place aforesaid in Criminal No. 25-10045-PBS, United States of America v. Lina Maria Orovio-Hernandez, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 28th day of May, 2025.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER